IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No.   15-cv-00406-LTB-NYW

DANIEL P. KAUFMAN,

      Plaintiff,

v.

UNIVERSITY OF COLORADO AT BOULDER, through its Board, the Regents of the University of Colorado,
DR. ANDREW COWELL, in his Individual Capacity, and
BRONSON HILLIARD, in his Individual Capacity,

      Defendants.

_____

### ORDER DISMISSING SECOND AMENDED COMPLAINT
_____

This case is before me on motions to dismiss filed by the captioned Defendants (whom I will call CU, Cowell, and Hilliard), in which they seek dismissal of the claims asserted against them in Plaintiff Daniel P. Kaufman's Second Amended Complaint [Doc. # 46] ("complaint").  I have reviewed all briefing on the motions and determined that oral argument would not materially assist me in deciding them.  I have jurisdiction under 28 U.S.C. § 1331.

As detailed below, I **GRANT** CU's motion [Doc. # 54] and dismiss with prejudice the Rehabilitation Act claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6).  I **GRANT IN PART AND DENY IN PART** Hilliard's [Doc. # 51] and Cowell's [Doc. # 55] motions; I dismiss with prejudice the 42 U.S.C. § 1983 claim against them pursuant to Rule 12(b)(6) but decline to exercise supplemental jurisdiction over, and therefore dismiss without prejudice, the state law claims against them.

## I.  Background

This lawsuit arises out of CU's decision to exclude Kaufman, an Associate Professor of Philosophy at CU, from campus for 12 weeks in 2014, with pay, after he told Cowell, his department chair, that he would not kill himself, Cowell, or anyone else unless they were "truly evil" or "had Hitler's soul."  *See* 2d Am. Compl. ¶¶ 4, 27, 29, 37 [Doc. # 46].  This comment followed years of other reported threats and disruptive behavior by Kaufman, including comments when CU was considering him for tenure regarding killing himself and others.  *See* Ex. A to CU Mot. at 2 [Doc. # 53-1].  CU allowed Kaufman to return to campus after a risk assessment found insufficient evidence to conclude that he posed a risk of proactive violence toward people or property.  2d Am. Compl. ¶ 33 [Doc. # 46]; Ex. B to CU Mot. at 2 [Doc. # 53-2].  After some back-and-forth, CU allowed Kaufman to retain an accommodation it had previously granted him—a twice-weekly teaching schedule—based on his anxiety and depression.  2d Am. Compl. ¶¶ 22-24, 34, 43-46 [Doc. # 46].  The *Boulder Daily Camera* wrote about the exclusion and risk assessment, and Kaufman alleges that Hilliard (a CU spokesman) provided information to the paper.  *Id.* ¶¶ 7, 41.

Although Kaufman remains employed by CU, he was humiliated by the episode.  *Id.* ¶¶ 1, 47.  He also alleges that he has lost some of his outside income, such as for speaking engagements, due to his damaged reputation.  *Id.* ¶ 47.  Kaufman now sues CU and, in their individual capacities, Cowell and Hilliard.  Against CU, he brings discrimination and retaliation claims under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* (Counts 1 and 2); against Cowell and Hilliard, claims for depriving him of his liberty interest in his good name and reputation without due process of law under 42 U.S.C. § 1983 (Count 3) and for intentional

infliction of emotional distress under state law (Count 4); and against Hilliard alone, a state law claim for defamation *per quod* (Count 5).  *Id.* ¶¶ 48-94.

## II.  Standard of Review

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  The plausibility requirement serves to "weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008).  The requirement also helps to "avoid ginning up the costly machinery associated with our civil discovery regime on the basis of a largely groundless claim."  *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (citation omitted).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal quotations, citation, and brackets omitted).  In deciding such a motion, the court assumes that the plaintiff's well-pleaded factual allegations are true and views them in the light most favorable to the plaintiff.  *Iqbal*, 556 U.S. at

679; *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012).  By contrast, the court does not

accept legal conclusions as true.  *Khalik v. United Airlines*, 671 F.3d 1188, 1190 (10th Cir. 2012)

(quoting *Iqbal*, 556 U.S. at 677).  "Accordingly, in examining a complaint under Rule 12(b)(6),

[the court] will disregard conclusory statements and look only to whether the remaining, factual

allegations plausibly suggest the defendant is liable."  *Khalik*, 671 F.3d at 1191.  In addition to

considering the allegations contained within the four corners of the complaint, "the district court

may consider documents referred to in the complaint if the documents are central to the

plaintiff's claim and the parties do not dispute the documents' authenticity."  *Jacobsen v.

Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

### III.  Facts

#### A.  Complaint

The following facts are drawn from the complaint.  Kaufman alleges that he began

working at CU in 2004 as an Assistant Professor of Philosophy.  2d Am. Compl. ¶ 17 [Doc.

# 46].  In 2006, he was diagnosed with major depression with psychotic features and severe

anxiety.  *Id.* ¶ 19.  He has taken various medications and has been hospitalized multiple times as

a result of these conditions.  *Id.*  "[B]eginning in 2006 and continuing to the present time,"

Kaufman "disclosed his major depression to his CU managers."  *Id.* ¶ 21.  In 2009, CU granted

Kaufman tenure and promoted him to Associate Professor.  *Id.* ¶ 18.  In 2012, CU granted

Kaufman's request for a "twice weekly (Tuesday/Thursday) teaching schedule" so he could

attend medical appointments and "participate in wellness activities, some of which were only

available on Mondays, Wednesdays, or Fridays," although he alleges that Graeme Forbes, the

chair of his department at the time, was "hostile" toward this accommodation.  *Id.* ¶¶ 22-24.

In 2013, Cowell became chair of the Philosophy Department.  *Id.* ¶ 25.  In January 2014, Cowell sent an email identifying Kaufman as "one of three problem people (the one with the ADA issues)."  *Id.* ¶ 26.  On February 18, 2014, Cowell and Kaufman "met for the first time." *Id.* ¶ 27.  Cowell "questioned Dr. Kaufman at length regarding his depression and anxiety, including asking whether Professor Kaufman had ever attempted suicide."  *Id.*  Kaufman told Cowell that he "was seeing a psychiatrist and a psychologist and that he was taking medications that were effective in treating his symptoms."  *Id.*  Kaufman then made the remarks that are at the center of this case, stating that he would not kill himself, Cowell, or anyone else unless they were "truly evil" or "had Hitler's soul."  *Id.* ¶¶ 4, 27.  At the end of the meeting, Cowell informed Kaufman that although Dr. Kaufman had been receiving an accommodation, it was not "official."  *Id.*

While "Dr. Cowell acknowledged that he did not consider Kaufman's comments to be a threat," he nonetheless "conferred with various CU offices including the Office of Discrimination and Harassment, the CU risk assessment group, Dean Leigh, Provost Moore, and the Office of University Counsel."  *Id.* ¶ 28.  "CU and Cowell decided that [he] should be excluded and banished from campus" and required to "undergo a 'violence assessment' by professional psychologists before he would be allowed to return to work."  *Id.*  Kaufman alleges that they did so "because they stereotyped [him] as mentally ill and dangerous due to his disabilities of depression and anxiety."  *Id.*  Kaufman alleges that "non-disabled faculty members had engaged in alarming behavior before," but "CU has rarely excluded or banished a faculty member from campus or required a 'violence assessment.'"  *Id.*

CU notified Kaufman of his exclusion on March 4, 2014.  *Id.* ¶ 29.  Cowell stopped by Kaufman's office and summoned him to a meeting with administrators at which he was given a letter from CU Provost Russell Moore explaining this decision.  *Id.* ¶ 30; *see also infra* Sec. III.B.  On the way to the meeting, Cowell and Kaufman stopped by Kaufman's classroom and Kaufman "turned the class over to one of his teaching assistants."  *Id.* ¶ 29.  Police officers stood around the classroom (in view of students), were at the meeting with administrators, and accompanied Kaufman (again, in view of students) after the meeting to retrieve his laptop and bike from a student lounge.  *Id.* ¶¶ 29-30.  That same day, Cowell sent an email to faculty in the Philosophy Department stating that Kaufman was on leave, that he had been excluded from campus, and that anyone who saw him on campus should "dial 911 and report [it] to the CU Police Department immediately."  *Id.* ¶ 31.

On March 6, 2014, the *Camera* reported that CU spokesman Ryan Huff "confirmed that a 'personnel action [occurred] on our campus' and that CU had their 'police department in the area in case they're needed.'"  *Id.* ¶ 32.  The "reason for the exclusion was not discussed," but Kaufman alleges that readers "believed that [he] must have engaged in gender discrimination/sexual misconduct" because a report by the American Philosophical Association had identified problems in this regard in CU's Philosophy Department.  *Id.*

During his exclusion, Kaufman underwent the risk assessment (or violence assessment, as he sometimes refers to it) with two psychologists, John Nicoletti and Sara Garrido.  *Id.* ¶ 33.  "CU demanded this assessment even though Dr. Kaufman provided letters from his treating physicians confirming that he did not pose a threat to himself or others and was in possession of this material prior to or during the assessment."  *Id.*  Also during his exclusion, Kaufman

appealed the exclusion order.  *Id.* ¶ 35.  In addition, he filed a charge of discrimination with the Equal Employment Opportunity Commission and a notice of intent to sue pursuant to the Colorado Governmental Immunity Act, *see* Colo. Rev. Stat. § 24-10-109, both alleging disability discrimination and retaliation by CU.  2d Am. Compl. ¶ 36 [Doc. # 46].  Kaufman later amended his EEOC charge and notice of intent to sue.  *Id.* ¶¶ 40, 42.

On May 21, 2014, CU's chancellor lifted the exclusion order.  *Id.* ¶ 37.  On July 31, 2014, the *Camera* published an article with information provided by Hilliard regarding the risk assessment that Kaufman underwent.  *Id.* ¶ 41.  That article is described in more detail below.  *See infra* Sec. III.B.  On January 30, 2015, CU told Kaufman that he would be required to teach three times a week beginning in the fall of 2015; however, before the semester began, and after receiving more information about his conditions from his psychiatrist, CU agreed that he could retain his twice-weekly teaching schedule.  *Id.* ¶¶ 44-46.  Kaufman does not allege that his twice-weekly teaching schedule ever actually changed.

Kaufman was "severely humiliated as a result of his exclusion and Defendant CU's subsequent press releases and the press coverage."  *Id.* ¶ 47.  He alleges that faculty members at another university told him that there was "little interest in his candidacy" for a visiting professor position "given the media reports regarding his exclusion."  *Id.*  He alleges that he was disinvited from giving a particular presentation for the same reason, resulting in the loss of travel expenses and an honorarium.  *Id.*  He alleges that he has received no invitations to give presentations for the 2014-2015 academic year even though he normally receives at least two or three.  *Id.*  He alleges that he has had to "pay out-of-pocket approximately $100 to date" for a new medication to treat posttraumatic stress disorder and anxiety resulting from Defendants' conduct.  *Id.*

Finally, he alleges that he has had trouble finishing an editing project, causing a "delay in being paid" for the project.  *Id.*

**B.  Additional Documents**

In addition to the complaint, I will consider the following four documents that Defendants have submitted with their briefing because Kaufman references them in his complaint, he has not disputed their authenticity, and they are central to his claims.  *See Jacobsen*, 287 F.3d at 941; *VanLandingham v. Grand Junction Reg'l Airport Auth.*, 603 F. App'x 657, 661 (10th Cir. 2015) (unpublished) (district court properly considered document attached to defendant's Rule 12(b)(6) motion without converting motion into one for summary judgment where document was referred to in complaint, was central to plaintiff's claims, and neither party disputed its authenticity).  In his response brief, Kaufman does not contest that I may properly consider these documents.

First, I will consider the letter from Provost Moore, which Kaufman alleges "inform[ed] [him] that he was being immediately excluded from CU and was being required to undergo" a risk assessment.  2d Am. Compl. ¶ 30 [Doc. # 46]; Ex. A to CU Mot. [Doc. # 53-1].  ████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

Second, I will consider the report summarizing the results of the risk assessment, which Kaufman alleges "confirmed [he] posed no threat to CU employees or students."  2d Am. Compl. ¶ 33 [Doc. # 46]; Ex. B. to CU Mot. [Doc. # 53-2].  While Kaufman alleges that CU provided false or misleading information to the evaluators, he does not allege that any of the contents of the report are inaccurate.  2d Am. Compl. ¶ 33 [Doc. # 46].  ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

Third, I will consider the March 4, 2014 email from Cowell to faculty in the Philosophy Department.  As noted, Kaufman alleges that the email stated that he had been excluded from

9

campus and "instructed faculty to call 911 if they saw Professor Kaufman on campus."  2d Am.

Compl. ¶ 6 [Doc. # 46]; Ex. B to Cowell Mot. [Doc. # 55-1].  The email does not indicate why

Kaufman was excluded.  Further, it instructs recipients that "this message is highly confidential,

and should not be shared with anyone."  *Id.*  It also instructs recipients to tell anyone who asks

about Kaufman's absence that "it is a private and confidential personnel issue."  *Id.*

Fourth, I will consider the July 31, 2014 *Camera* article.  *See* 2d Am. Compl. ¶ 41 [Doc.

# 46] (describing article); Ex. D to Cowell Mot. [Doc. # 55-2].  The article states that CU paid

$2,625 to Nicoletti "for services in connection with Kaufman."  *Id.* at 1.  While "Hilliard

declined to comment on Kaufman's situation, saying that it was a personnel matter," Hilliard did

say that, "broadly speaking," Nicoletti's consulting focuses on "assessing the impact to the

teaching and learning environment of a disruptive faculty member, staff, or student, or it can

focus on why such behavior is occurring."  *Id.*  Hilliard also said that it was "rare for the

university to obtain these kinds of assessments."  *Id.* at 2.  Hilliard further noted that "[i]n the

post-Virginia Tech era, and in the shadow of the Aurora theater shootings, all universities must"

"take[] all threats or comments that can be interpreted as threats very seriously" to "ensure the

safety of their communities."  *Id.* at 1.

## IV.  Analysis

### A.  Rehabilitation Act Discrimination Claim

#### 1.  Elements of Claim

Section 504 of the Rehabilitation Act provides in relevant part that "[n]o otherwise

qualified individual with a disability . . .  shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a claim under this provision, a plaintiff must show that (1) he is an "individual with a disability"; (2) he is "otherwise qualified" to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against him solely by reason of his disability. *Cohon v. New Mexico Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011); *Barber v. Colorado Dep't of Revenue,* 562 F.3d 1222, 1228 (10th Cir. 2009); *see also Chambers v. Melmed*, 141 F. App'x 718, 723 (10th Cir. 2005) (unpublished). At this juncture, the parties dispute only the fourth element, discrimination.

To demonstrate discrimination, a plaintiff generally must show that he has suffered an adverse employment action. *See, e.g., E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011) (applying requirement to ADA discrimination claim); *Massari v. Potter*, No. 04-CV-02306-EWN-MJW, 2006 WL 318658, at *7 (D. Colo. Feb. 9, 2006) (applying requirement to Rehabilitation Act discrimination claim). One alternative is to show that he was subjected to a hostile work environment. *See Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998) (recognizing such a claim under Title VII); *Quiles-Quiles v. Henderson*, 439 F.3d 1, 7 (1st Cir. 2006) (recognizing such a claim under Rehabilitation Act); *Pueschel v. Peters*, 577 F.3d 558, 564 (4th Cir. 2009) (same).

Section 504 has a "strict 'sole factor' causation requirement." *Gilbert v. Bentsen*, No. 94-1193, 1995 WL 94640, at *4 (10th Cir. 1995) (unpublished) (citing *Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 605 (10th Cir. 1994)). In contrast with the "laxer causation requirements of Title VII and other antidiscrimination statutes," a plaintiff suing under Section 504 must show that the defendant discriminated against him "solely" because of his disability.

*Id.* "The word *solely* provides the key: the discrimination must result from the handicap and from the handicap alone." *Johnson ex rel. Johnson v. Thompson*, 971 F.2d 1487, 1493 (10th Cir. 1992) (emphasis in original), *cert. denied*, 507 U.S. 910 (1993); *see also Pushkin v. Regents of Univ. of Colorado*, 658 F.2d 1372, 1386-87 (10th Cir. 1981) (to make out prima facie case and shift to defendant burden of showing that "rejection from the program was for reasons other than his handicap," plaintiff must first show that he "was rejected under circumstances which give rise to the inference that his rejection was based solely on his handicap").

The Tenth Circuit has recognized that an employer may "take appropriate action with respect to an employee on account of egregious or criminal conduct" that is "caused by [the employee's] disability" without being liable under Section 504 for discriminating "solely by reason of" the disability. *Williams v. Widnall*, 79 F.3d 1003, 1007 (10th Cir. 1996) (internal quotations, citation, and brackets omitted). In *Williams*, the plaintiff argued that the Air Force was liable because it dismissed him from his job based on "threats against his supervisor and co-workers" that he made as "a direct result of" his alcoholism. *Id.* While the court held that his alcoholism was a disability, it rejected "an interpretation of the statute which would require an employer to accept egregious behavior by an alcoholic employee when that same behavior, exhibited by a nondisabled employee, would require termination." *Id.* The court held that the plaintiff was dismissed "for his egregious conduct and the threat it posed to the safety of his supervisor and co-workers," not his alcoholism. *Id.*

## 2. Analysis

Kaufman alleges that the exclusion, risk assessment, email from Cowell to faculty in the Philosophy Department, provision of information to the *Camera*, and aborted withdrawal of his

twice-weekly teaching schedule constitute adverse employment actions and/or created a hostile

work environment to which he was subjected.  2d Am. Compl. ¶¶ 53-54 [Doc. # 46].  CU

disputes whether these actions constitute adverse employment actions or were sufficient to create

a hostile work environment.  Even assuming that they do, however, Kaufman's Section 504

claim fails because he has not plausibly alleged that CU took these actions solely because of his

disability.

The only plausible reading of Kaufman's complaint and the additional documents he has

placed under consideration is that his disruptive and/or threatening behavior was the reason (or

at least one of the reasons) for CU's decision to exclude him from campus and require him to

undergo a risk assessment.  In brief, Kaufman has "plead[ed] himself out of court by alleging

facts which show that he has no claim."  *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th

Cir. 2013) (internal quotations and citation omitted), *cert. denied,* 134 S. Ct. 1308 (2014); *see*

*also Lewin v. Med. Coll. of Hampton Roads*, 910 F. Supp. 1161, 1172 (E.D. Va. 1996) (granting

Rule 12(b)(6) motion where, "[b]y Plaintiff's own indirect and direct admissions, Defendants

based their decision to dismiss Plaintiff on a number of factors, which may have included a

perceived disability"), *aff'd*, 131 F.3d 135 (4th Cir. 1997).

Kaufman admits that he told Cowell that he would not kill himself, Cowell, or anyone

else unless they were "truly evil" or "had Hitler's soul."  2d Am. Compl. ¶¶ 4, 27 [Doc. # 46].

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ Ex. A to CU

Mot. at 1-2 [Doc. # 53-1].  Kaufman does not identify any way in which this description of his

conduct, or how CU viewed that conduct, is inaccurate.  ██████████████████

████████████████████████████████████████████████████

███████  *See supra* Sec. III.B.

      Kaufman makes much of the fact that "Cowell . . . did not consider Dr. Kaufman's

comments during the meeting to be a threat."  2d Am. Compl. ¶ 5 [Doc. # 46].  But Kaufman's

Section 504 claim is against CU, not Cowell, and, according to his complaint, "various CU

offices, including the Office of Discrimination and Harassment, the CU risk assessment group,

Dean Leigh, Provost Moore, and the Office of University Counsel" were also involved in the

decision to exclude him.  *Id.* ¶ 28.  In any event, Kaufman alleges no facts to suggest that CU's

belief that it needed to take his comments—joking or not—seriously to protect the tens of

thousands of people on the CU campus from even the possibility of harm was insincere or

pretextual.

      While Kaufman alleges that CU excluded him "based upon [its] unlawful stereotyping of

[him] as a potentially dangerous person given his severe depression and anxiety disorder," *id.* ¶

5, this is a conclusory allegation that has no factual support in the complaint or the incorporated

documents.  *See also id.* ¶¶ 28, 54 (making similar allegations); *Khalik*, 671 F.3d at 1190-91.

Indeed, they undermine it.  For example, Kaufman alleges that he has been employed by CU

since 2004, that CU has been aware of his alleged disability since 2006, and that it granted him

tenure in 2009.  2d Am. Compl. ¶¶ 17-19 [Doc. # 46].  Yet he does not explain why CU would

begin "stereotyping" him in 2014 on the basis of a disability it had known about for many years, or on the basis of an accommodation request he made in 2012. *See id.* ¶ 22. The only plausible inference that can be drawn, therefore, is that it was Kaufman's behavior, not his disability, that prompted the exclusion and risk assessment. *See Shah v. Univ. of Texas Sw. Med. Sch.,* 54 F. Supp. 3d 681, 705 (N.D. Tex. 2014) (granting Rule 12(b)(6) motion where plaintiff's other allegations "directly undermine his allegation that he was dismissed solely by reason of his disability") (brackets and internal quotations omitted).

To the extent Kaufman claims that the Rehabilitation Act required CU to ignore his behavior merely because it may have been caused by his disability, *Williams, supra,* 79 F.3d 1003, forecloses this argument. Kaufman alleges that, "[a]lthough non-disabled faculty members had engaged in alarming behavior before, CU has rarely excluded or banished a faculty member from campus or required a 'violence assessment.'" 2d Am. Compl. ¶ 28 [Doc. # 46]. But this allegation does not make his claim plausible because he identifies neither the conduct nor the faculty members in question. *See Khalik*, 671 F.3d at 1194 (affirming Rule 12(b)(6) dismissal of claims alleging employment discrimination based on race, religion, national origin, and ethnic heritage where the plaintiff omitted "certain details [she] should know and could properly plead to satisfy the plausibility requirement," including "details about how Defendant treated her compared to other non-Arabic or non-Muslim employees"). And no facts alleged elsewhere suggest that a non-disabled employee who engaged in a similar pattern of behavior would not have been treated as Kaufman was. Indeed, the only aspect of this allegation that is supported by facts is the implicit acknowledgment that Kaufman engaged in "alarming behavior."

Accordingly, with regard to the exclusion and risk assessment, Kaufman's Section 504 claim fails for lack of causation. The same is true with respect to the email to faculty members and release of information to the *Camera,* upon which Kaufman also relies to make out both his adverse employment action and hostile work environment theories of discrimination. These actions were ancillary to the exclusion and risk assessment, and Kaufman has alleged no facts to suggest that CU took them solely because of his disability. If anything, the email and *Camera* articles suggest that CU made efforts to protect Kaufman's privacy while also ensuring the safety of Kaufman's colleagues and respecting the public's interest in being informed about the incident. The email said nothing regarding why Kaufman was excluded and instructed recipients not to forward the message and to tell anyone who inquired about Kaufman's absence that the matter was private and confidential. *See* Ex. B to Cowell Mot. [Doc. # 55-1]. While the March 6, 2014 *Camera* article has not been provided, Kaufman admits that the "reason for [his] exclusion was not discussed." 2d Am. Compl. ¶ 32 [Doc. # 46]. Similarly, the July 31, 2014 article notes that Hilliard refused comment on the specifics of Kaufman's situation. *See* Ex. D to Cowell Mot. at 1-2 [Doc. # 55-2]. Accordingly, the email to faculty members and provision of information to the *Camera* cannot support Kaufman's Section 504 claim.

I must still address the final act upon which Kaufman relies to support his Section 504 claim: CU's aborted withdrawal of his twice-weekly teaching schedule. Kaufman alleges no facts to suggest that CU withdrew this accommodation (before reinstating it after receiving additional information) solely because of his disability. Indeed, under the Rehabilitation Act, once an "employee has identified the nature of [his] disability and requested accommodation," an employer "has a duty to gather sufficient information from the [employee] and qualified

experts as needed to determine what accommodations are necessary to enable the [employee] to perform the job." *Woodman v. Runyon*, 132 F.3d 1330, 1345 (10th Cir. 1997) (emphasis removed; internal quotations and citation omitted).  More importantly, Kaufman does not allege that CU ever actually failed to provide his accommodation, *i.e.,* that he was ever required to teach more than twice a week, so CU's actions cannot constitute an adverse employment action. *See Hwang v. Kansas State Univ.*, 753 F.3d 1159, 1161 (10th Cir. 2014) (plaintiff must show, inter alia, that "[his] employer *failed to provide* a reasonable accommodation despite [his] request for one") (emphasis added).  And they are neither frequent nor severe enough to have created a hostile work environment.  *See Hernandez v. Valley View Hosp. Ass'n,* 684 F.3d 950, 957-58 (10th Cir. 2012); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1243 (10th Cir. 2001). Thus, Kaufman's Section 504 claim based on the aborted withdrawal of his accommodation fails because he has not adequately alleged either causation or discrimination.

**B.  Federal Rehabilitation Act Claim for Retaliation**

**1.  Elements of Claim**

To establish a prima facie case of retaliation under the Rehabilitation Act, a plaintiff must show "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action."  *Jarvis v. Potter*, 500 F.3d 1113, 1125 (10th Cir. 2007).  To establish protected employee action, Kaufman relies on his 2012 request for accommodation; his conversation with Cowell in February 2014 regarding his accommodation; his doctor's submission of an accommodation request form in March 2014; and his internal appeal of the exclusion order, his EEOC complaint, and his notice of intent to sue, all

of which he filed between April and August of 2014.  2d Am. Compl. ¶¶ 61-62 [Doc. # 46].  I

address these actions in turn.

### 2.  2012 Accommodation Request

I begin with the 2012 accommodation request, which is undisputedly protected employee

action.  *See Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007).  Kaufman alleges he

made the request in June to the chair of his department at the time, that he renewed the request

with CU's "ADA Coordinator" in September after the chair was "hostile" to it, and that CU

approved the request in October.  2d Am. Compl. ¶¶ 23-24 [Doc. # 46].  All of this happened in

2012, but each of Kaufman's alleged adverse actions—the same conduct discussed above in

connection with his Section 504 claim—occurred in 2014.  *Id.* ¶ 64.  The first of those actions,

the exclusion, occurred on March 4, 2014, about 18 months after Kaufman's request in

September 2012.  *Id.* ¶ 67.  "[U]nless the adverse action is *very closely* connected in time to the

protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity

to establish causation."  *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004)

(emphasis in original; internal quotations, citation, and brackets omitted).  "A six-week period

between protected activity and adverse action may be sufficient, standing alone, to show

causation, but a three-month period, standing alone, is insufficient."  *Id.*  Here, Kaufman has

alleged no facts that make it plausible that a causal connection exists between his 2012

accommodation request and any of the alleged adverse actions.  Therefore, he cannot make out

his retaliation claim on the basis of this request.

### 3.  February 18, 2014 Discussion with Cowell

I turn to Kaufman's alleged February 18, 2014 "discuss[ion] [of his] scheduling

accommodation" with Cowell, during which he alleges he "advised Professor Cowell of his previously granted schedule accommodation." 2d Am. Compl. ¶¶ 4, 27 [Doc. # 46]. There is no indication that this discussion of an accommodation that Kaufman was already receiving rose to the level of "opposition to discrimination" or any other type of activity that constitutes protected action. *See C.R. England, Inc.*, 644 F.3d at 1051. I disregard Kaufman's later, conclusory characterization of his statement as a "request[] [for] a reasonable accommodation" because it contradicts his factual allegations that Kaufman and Cowell merely discussed his existing accommodation. *See* 2d Am. Compl. ¶ 61 [Doc. # 46]; *McKinley Med., LLC v. Medmarc Cas. Ins. Co.*, No. 11-CV-01218-CMA-KMT, 2012 WL 987821, at *5 (D. Colo. Mar. 23, 2012) (on Rule 12(b)(6) motions, "courts must liberally construe and accept as true allegations of fact in the complaint and inferences reasonably deductive therefrom, [but] they need not accept factual claims that are internally inconsistent") (internal quotations and citation omitted).

In addition, while the conversation with Cowell was close in time to the exclusion and risk assessment, causation is nevertheless lacking because Kaufman has not alleged that anyone beyond Cowell knew of Kaufman's remarks regarding his accommodation. As noted, Kaufman alleges that the decision to exclude him and require him to undergo a risk assessment was made by various individuals in the CU administration, including Provost Moore, who authored the exclusion letter. 2d Am. Compl. ¶ 28 [Doc. # 46]. If they did not know of his remarks, a causal connection cannot exist. Kaufman argues that his claim is saved by his allegation that Cowell "participated" in CU's decision. *Id.* ¶ 80. However, while a plaintiff may base a retaliation claim on the actions of a "subordinate [without] decisionmaking power," "the requisite causal relationship" between the "subordinate's actions and the adverse employment action" must exist,

and "mere influence or input in the decisionmaking process" is not enough. *Llamas v. QC Fin. Servs., Inc.*, No. 14-3058, 2015 WL 4175020, at *7 (10th Cir. July 13, 2015) (unpublished) (internal quotations omitted) (citing *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 487-88 (10th Cir. 2006)). Finally, stepping back, it is simply implausible that any "opposition to discrimination" Kaufman may have engaged in—███████████████ ████████████████████ and his comments to Cowell regarding killing, as outlined in the complaint and other documents under consideration—caused CU to exclude him and require him to undergo a risk assessment.

### 4. March 5, 2014 Submission of Accommodation Request Form

While CU does not dispute that Kaufman's doctor's March 5, 2014 submission of "CU's 'formal' ADA Accommodation Request Form" was protected employee action, by this point CU had already ordered the exclusion and risk assessment, leaving only the disclosure of information to the *Camera* and CU's aborted withdrawal of his accommodation as alleged adverse actions. 2d Am. Compl. ¶ 34 [Doc. # 46].

In regard to the disclosure of information to the *Camera*, Kaufman does not allege any facts suggesting that Hilliard knew of the request submitted by Kaufman's doctor; obviously, if he did not know of the request, he could not have retaliated against Kaufman for making it. Accordingly, no plausible causal connection between the request and the disclosures to the *Camera* has been alleged. *See Hwang*, 753 F.3d at 1165 (affirming Rule 12(b)(6) dismissal of retaliation claim where plaintiff "doesn't offer any facts suggesting that the University officials who decided not to hire her knew about her . . . past opposition to discrimination"). To the contrary, and as noted above, the only plausible inference that can be drawn from the facts that

*have* been alleged is that the disclosure of information to the *Camera* was closely connected with the exclusion and risk assessment and was a foreseeable result of Kaufman's admittedly alarming conduct.

CU's aborted withdrawal of Kaufman's accommodation also cannot support a retaliation claim in conjunction with the doctor's submission. As noted above, Kaufman does not allege that CU ever failed to provide him with his accommodation of a twice-weekly teaching schedule. 2d Am. Compl. ¶¶ 44-46 [Doc. # 46]. Thus, Kaufman has not adequately alleged an adverse employment action. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012) (adverse action must be "material" and "ris[e] to a level of seriousness") (internal quotations and citation omitted). Further, Kaufman alleges that CU told him it was withdrawing the accommodation on January 30, 2015, 10 months after the doctor's submission. 2d Am. Compl. ¶ 34 [Doc. # 46]. Ten months is too long an interval to presume a causal connection, *see Meiners*, 359 F.3d at 1231, and Kaufman has alleged no facts to suggest the submission had anything to do with CU's decision the following year to withdraw his accommodation.

### 5. Complaints of Discrimination from April 2014 to August 2014

Kaufman likewise cannot base a retaliation claim on the various complaints of discrimination he lodged from April to August 2014, including his internal appeal of the exclusion order, EEOC charges of discrimination (both original and amended), and notices of intent to sue (both original and amended). 2d Am. Compl. ¶ 62 [Doc. # 46]. The only alleged conduct to follow that activity is the aborted withdrawal of Kaufman's twice-weekly teaching schedule, which, again, cannot constitute an adverse employment action. In addition, too much time passed between the April 2014 to August 2014 time period and CU's notification to

21

Kaufman in January 2015 that it was withdrawing his accommodation to presume causation, and no other facts supporting a causal connection are alleged.

### 6. Retaliation Based on Hostile Work Environment

Kaufman alleges that the adverse employment actions described above also created a hostile work environment to which he was subjected. The Tenth Circuit has recognized retaliation claims based on a hostile work environment in the Title VII context. *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998) (noting that "co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim"). Assuming such a claim is cognizable under the Rehabilitation Act, it would fail here because Kaufman cannot show a causal connection between any protected action he took and the hostile work environment. Even to the extent he could show a causal connection between protected action and certain isolated incidents, those incidents would not be severe or frequent enough to support a showing of a hostile work environment. *See supra* Sec. IV.A.2.

### C. Federal Section 1983 Claim for Violation of Due Process

Kaufman sues Hilliard and Cowell under 42 U.S.C. § 1983 for depriving him of his "liberty interest in his good name and reputation" without due process of law. 2d Am. Compl. ¶¶ 70-78 [Doc. # 46]. This claim must be dismissed because Kaufman has not alleged that CU terminated him.

The government infringes upon a public employee's liberty interest in his good name and reputation only where, among other things, "the statement is made during the course of termination *and* forecloses other employment opportunities." *McDonald v. Wise*, 769 F.3d 1202,

1212 (10th Cir. 2014) (emphasis in original; internal quotations and citation omitted).  This

holding follows from the U.S. Supreme Court's rejection of the notion that "a hearing would be

required each time the State in its capacity as employer might be considered responsible for a

statement defaming an employee who continues to be an employee."  *Paul v. Davis*, 424 U.S.

693, 710 (1976).  The Court noted that it had "never held that the mere defamation of an

individual . . . was sufficient to invoke the guarantees of procedural due process absent an

accompanying loss of government employment."  *Id.* at 706.

    While the Tenth Circuit once suggested in *dicta* that a plaintiff may state a claim by

showing *either* that the employer made the offending statement during the course of termination

*or* that the statement foreclosed other employment opportunities, *see Workman v. Jordan*, 32

F.3d 475, 481 (10th Cir. 1994), the court later acknowledged that it erred in so suggesting.  *See*

*McDonald*, 769 F.3d at 1212 n.3 (noting that the requirement "should have been phrased

conjunctively"); *accord Renaud v. Wyoming Dep't of Family Servs.*, 203 F.3d 723, 728 n.1 (10th

Cir. 2000) (noting that the U.S. Supreme Court's decision in "*Paul* clearly requires that the

defamation occur in the course of the termination of employment" and that the "*Workman* court

did not intend to create a test under which a liberty interest might be infringed by any

defamatory statement that might foreclose future employment opportunities").

    Kaufman's reliance upon lost supplemental income—all from sources other than CU—is

insufficient under this precedent to make out his Section 1983 claim.  *See* 2d Am. Compl. ¶ 47

[Doc. # 46].  Because he has not alleged termination by CU, his Section 1983 claim necessarily

fails.  And even if there were conflicting authority on this issue, Cowell and Hilliard would be

entitled to qualified immunity because their alleged conduct did not violate "clearly established

23

statutory constitutional rights of which a reasonable person would have known." *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

**D.  State Law Claims**

While a federal court may exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," it "may decline to exercise supplemental jurisdiction" over a claim where it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(a) & (c)(3).  The Tenth Circuit has held that, "generally," where "federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) (internal quotations and citation omitted); *Bauchman v. West High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997).  As I have dismissed Kaufman's federal claims, all that remain are his state law claims for intentional infliction of emotional distress (Count 4) and defamation *per quod* (Count 5).  The parties have offered no reason why these claims should be resolved in a federal forum and I perceive none. Accordingly, they will be dismissed without prejudice to Kaufman's ability to reassert them in a state forum.

**V.  Conclusion**

For the reasons set forth above, it is

**ORDERED** that Defendant University of Colorado at Boulder's Motion to Dismiss Second Amended Complaint [Doc. # 54] is **GRANTED**.  It is further

**ORDERED** that Defendant Andrew Cowell's Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [Doc. # 55] and Defendant Bronson Hilliard's Motion to Dismiss Second Amended Complaint Asserting Qualified Immunity [Doc. # 51] are **GRANTED IN PART AND DENIED IN PART**.  It is further

**ORDERED** that Counts 1, 2, and 3 of the Second Amended Complaint [Doc. # 46] are **DISMISSED WITH PREJUDICE** and Counts 4 and 5 are **DISMISSED WITHOUT PREJUDICE**.  It is further

**ORDERED** that Defendants shall have their costs.  It is further

**ORDERED** that, on or before November 19, 2015, each party shall file with the Court a document showing in "redline" or "track changes" any redactions to this order it deems necessary given the discussion herein of materials subject to the Protective Order [Doc. # 25] entered in this case.  It is further

**ORDERED** that this order shall be placed under a Level 1 restriction in the Court's CM/ECF system until further order of the Court.

DATED: November __5__, 2015.

BY THE COURT:


___s/Lewis T. Babcock_____
LEWIS T. BABCOCK, JUDGE

25